Geraldine HAMMOND,
Plaintiff-Appellant,

v.

The INDEPENDENT LIFE AND ACCIDENT INSURANCE COMPANY,
Defendant-Appellee.

Court of Appeals of Tennessee,
Western Section.

Aug. 14, 1979.

Certiorari Denied by Supreme Court
Oct. 29, 1979.

Jack D. McNeil, Memphis, for plaintiff-appellant.

William H. Luck, Memphis, for defendant-appellee.

EWELL, Judge.

Geraldine W. Hammond, widow of Thomas J. Hammond, Jr., sued The Independent Life and Accident Insurance Company in the Chancery Court of Shelby County for the face amount ($25,000.00) of a life insurance policy dated March 25, 1975, issued by the defendant on the life of plaintiff's husband with plaintiff designated therein as beneficiary. The defendant denied liability charging that the policy would not have been issued but for material misrepresentations made by the insured in the application, which misrepresentations induced the issuance of the policy and increased the risk. The policy was issued without medical examination. After claim was made under the policy defendant returned all premiums paid. The Chancellor found for the defendant, dismissed the suit and declared the policy null and void from its inception. Plaintiff appealed under six assignments of error which, in summary, charge three errors as follows:

(1) The Trial Court erred in holding for the defendant because there was no finding of fraudulent material misrepresentation with actual intent to deceive.

(2) The Trial Court erred in holding for the defendant because the defendant failed to prove by clear and convincing evidence that the insured made material misrepresentations which increased the risk of loss.

(3) The Trial Court erred in holding for the defendant because the defendant had waived the information in question and was estopped to assert the defense relied upon because the insured had given the proper information to the agent for the defendant who filled out the application for insurance.

The application for insurance was taken on March 25, 1975, by Grady Newton Bennett, agent for Independent Life and personal friend of the insured. Part II of the application was a questionaire signed by the

1.a. Name and address of all physicians who attend family:

Dr. Farrell Varner

Bellview St., Memphis, Tenn.

b. Date, reason and by whom last consulted:

Flu, Dec. 1969

c. What treatment was given or medication prescribed?

Prescription and shot

2. Has any person proposed for coverage ever been treated for or *ever had any known indication of*: (emphasis added)           YES  NO

. . .

e. *Jaundice*, intestinal bleeding; ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, *or other disorder of the* stomach, intestines, *liver* or gallbladder? (emphasis added)           ___  X

. . .

1. Excessive use of alcohol, tobacco, or any habit-forming drugs?           ___  X

. . .

5. Other than above, has any person proposed for coverage within the past 5 years:

. . .

b. Had a checkup, consultation, illness, injury, surgery?           ___  X

. . .

All of the foregoing statements and answers were read by me and are fully and correctly recorded by the Field Underwriter. All answers are correct to the best of my belief and knowledge.

DATED AT ___Memphis, Tenn.___ ON _____ ___3-25___, 19_75_

WITNESS  /s/ Jack W. Kenner, Sr.                    /s/ Thomas J. Hammond, Jr.
               Field Underwriter                            Signature in full of
                                                            Proposed Insured

         /s/     Grady N. Bennett

insured after being completed by Bennett using information furnished by the insured during a personal interview. We copy pertinent portions of Part II of the application:

Page three of the application includes the following:

The undersigned declare that the statements and answers to the questions in this application including Part I and II and any supplements thereof or additions or amendments thereto, are complete and true to the best of their knowledge and belief.

The undersigned agree that: (1) these statements and answers shall form the basis for and become part of the contract of insurance applied for; . . . .

All of the foregoing statements and answers were read by me and were fully and correctly recorded by the Field Underwriter.

. . .

Dated at ___Memphis, Tennessee___ on ___March 25_____, 1975__
I certify that I have asked the questions, fully and completely recorded the answers, and witnessed the signatures.

/s/ Jack W. Kenner, Sr.
    Field Underwriter

/s/ Grady N. Bennett

/s/ Thomas J. Hammond, Jr.
Signature in full of
Proposed Insured or
Annuitant

---

The full application was attached to the policy which contained among the "General Provisions" the following paragraph:

> THE CONTRACT. This policy and the application therefor, a copy of which is attached hereto and made a part hereof, constitute the entire contract between the parties. All statements made by the Insured or by the Applicant, if other than the Insured, shall, in the absence of fraud, be deemed representations and not warranties and no such statement shall avoid the Policy or be used in defense of a claim hereunder unless it is contained in such application. No alteration of this Policy and no waiver of any of its provisions shall be valid unless made in writing by the Company and signed by an officer of the Company.

The proof showed that Dr. Farrell Varner was the physician who regularly treated several members of the Hammond family but that the insured was seen by Dr. John Barron on July 8, 1974, for a checkup. On physical examination Dr. Barron found that his eyes were slightly yellow tinted and his liver enlarged. Several tests were performed, three involving the liver function, and the results of those three tests were abnormal. Dr. Barron concluded that the insured had an abnormally functioning liver which he related to the drinking of alcoholic beverages. Thereafter he communicated with the insured by telephone to convey to him the test results, explain that he had some liver injury, damage or problem and advise that if he continued to drink, more serious health problems might develop in the future.

The application was made less than nine months following the examination by Dr. Barron. Within eleven months after the policy was issued the insured returned to Dr. Barron because his condition had worsened. His death from cirrhosis of the liver occurred exactly thirteen months from and after the policy date.

Attorney for the appellant, Mrs. Hammond, insists that it was error for the Trial Court to hold for the defendant when there was no finding of fraudulent material misrepresentations with actual intent to deceive. Appellant relies upon T.C.A. 56–1103 which provides as follows:

> MISREPRESENTATION OR WARRANTY WILL NOT AVOID POLICY—EXCEPTIONS.—No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the assured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter represented increases the risk of loss.

In his findings the Chancellor specifically states:

> The Court does not hold that the applicant fraudulently misrepresented matters to the Defendant Company, but the Court does find that the applicant failed to fully answer several questions and that this failure to answer fully and correctly did increase the risk of loss.

■ While the Chancellor did not find that the misrepresentations were made

with actual intent to deceive, he did find and hold that the misrepresentations (failure to answer fully and correctly) increased the risk of loss. This finding was sufficient to deny to appellant protection of T.C.A. 56–1103, and it was not error for the Trial Court to hold for the defendant although there was no finding of fraudulent misrepresentation with actual intent to deceive.

Appellant next insists that the defendant failed to prove by clear and convincing evidence that the insured made material misrepresentations which increased the risk of loss. In answering "no" to question 2(e) insured, in effect, denied that he had ever had any known indication of jaundice or other disorder of the liver. We have heretofore summarized the testimony of Dr. Barron which related directly to the condition of the insured's liver on July 8, 1974. The agent, Grady Newton Bennett, was called as a witness for appellant and was questioned at length with regard to the information provided to him by insured in response to question 2(e) of Part II of the application. The relevant portions of the testimony of Bennett are here quoted:

"Q. Read the question and the answer and then the communication that came about between you two as you did whatever you did out there that day.

"A. Okay. I asked if all of these, "Jaundice, intestinal bleeding, ulcer, hernia, appendicitis, colitis, diverticulitis, hemorrhoids, recurrent indigestion, or other disorder of the stomach, intestines, liver, or gallbladder?"

He said he had none and at this time here I think is where Dr. Barron was. I asked if he had ever had any liver trouble because I knew he drank, but, like I drink, too, but he was not no guy that got up every morning and got a bottle and started drinking. He had too much work for that.

I did ask if he had any liver trouble and he said he had discussed, when he went to Dr. Barron about his nerves that he had asked Dr. Barron about the liver, if he had any liver problem, and, but—He said he had none.

"Q. Was there any diagnosis of liver cirrhosis disease disorder discussed by Hammond as to Dr. Barron?

"A. No, sir, no disorder at all.

. . . . .

"Q. Just tell us what Hammond said about Dr. Barron that day.

"A. Sir, that is about the best I can describe it. When he said he had seen a Dr. Barron he told me that Dr. Barron had give him some Valium, I believe, five milligram Valium for his nerves and going through all of these questions about liver, intestinal bleeding, gallbladder, I asked him did Dr. Varner or Dr. Barron or anyone you have ever seen, you know, ever told you that you've got any problems with your liver or a disorder. I asked everybody that. That is routine when you are writing one of the applications, and he said no. That is the best I can explain.

"Q. When was the first date that you ever heard liver cirrhosis disease or disorder as to Thomas Hammond, as to the deceased?

"A. I didn't know he had it when he died. It was after he died that I knew it. I knew he was sick but I didn't know he was sick with that. I knew he was sick before he died.

"Q. On the date of the application what did Hammond say about Dr. Barron's communication as to liver disease or disorder?

. . . . .

"Q. Go ahead and answer that.

"A. Well, I really, I have answered it about as well as I can. He said he had no disorder of the liver. He—Evidently, Dr. Barron was the only one he ever discussed whether he had any liver problems or not. So, he said there was no disorder of the liver. So, you know, I didn't put anything on there about it.

"Q. What was your checkoff then?

"A. My checkoff was no.

"Q. Why did you check no and not yes?

"A. Because there is no disorder of the liver or gallbladder or any of the other things.

"Q. Okay. Now, back again before the objection, when is the first date you heard about any liver disease, disorder, or cirrhosis?

"A. That was after he died.

"Q. Coming on down, then, let me ask you this, why didn't you put Dr. Barron's name somewhere at that point as 2–E?

"A. I didn't feel like it was proper.

.    .    .    .    .

"Q. All right. Mr. Bennett, we are still on question two as to 2–E, and why didn't you put Dr. Barron's name on the application?

"A. I saw no reason to put the doctor's name on the application when he just went to him for a bottle of pills. He may have went to other doctors for a bottle of pills. He come to my model home and borrowed aspirin from me sometimes.

"Q. When would you put a doctor's name over here in the right side?

"A. If he had been to a doctor and he told me he had been to a doctor and had been treated and he told me what it was, if he took medication for it I would put it over there.

"Q. If he had liver cirrhosis, disease, or disorder, would you have put it on there?

"A. Yes, sir, I wouldn't have wrote the application. I would have to take it on a trial basis."

Jack Rice, Vice-President and Director of Ordinary Underwriting Division of the appellee insurance company, testified relative to the findings of Dr. Barron as follows:

"Q. If you had had the benefit of Dr. Barron's findings of enlargement of the liver and the tests being slightly above normal would you have sent him a questionaire?

"A. If we had had those findings we would not have. Had he admitted this to us we would have stopped the issuance or consideration at that time. If I may I would like to answer maybe in two parts. Had we had an indication that he had an enlarged liver we would be concerned to the effect that we could not consider that risk any further until we had a liver function test. Had those tests been negative we would have recognized he had a problem then and would have been in doubt what to do about it and would maybe have to call on, perhaps, a medical director or someone who could relate to it.

But we have the combination. We have had one, the enlarged liver or the test that indicated that the enlargement was significant. We would have at that point denied the insurance."

■ We cannot escape the conclusion that the insured misrepresented the condition of his health by failing to disclose to the agent in response to question 2(e) the fact that there was a known indication of disorder of his liver discovered by Dr. Barron less than nine months prior to his making application. The uncontroverted proof in the case reflects that this misrepresentation naturally and reasonably influenced the judgment of the appellee in issuing the policy. It follows that this was a misrepresentation which "increases the risk of loss" within the meaning of the statute. This is well established under the existing case law of this State. See *Tegethoff v. Metropolitan Life Insurance Company*, 57 Tenn.App. 695, 424 S.W.2d 565 (1966). We find, therefore, that the clear preponderance of the evidence in the case establishes that the insured made material misrepresentations which increased the risk of loss.

■ Appellant further insists that the insured advised agent Bennett that he had seen Dr. John Barron, that such knowledge imparted to appellee's agent constituted knowledge to appellee, that the issuance of the policy thereafter constituted a waiver by appellee of the defense now relied upon and that appellee would be estopped to deny coverage. Bennett testified that the insured told him of the examination by Dr. Barron and stated that based upon the information provided by the insured it was

his decision not to show the name of Dr. Barron in response to question 1 and question 5 on Part II of the application. However, through question 2(e) direct inquiry is made with respect to any known indication of disorder of the liver, and the uncontradicted proof is that the insured stated to Bennett that neither Dr. Varner nor Dr. Barron nor any other person had ever told him that he had any problem or disorder with his liver. We find that appellee was entitled to information within the knowledge of the insured concerning the condition of his liver, and we find no basis for holding that appellee had waived its right to this information. It follows that appellee was not estopped to rely on the defense of misrepresentation in the application.

We concur in the holding of the Chancellor. The assignments of error of the appellant are all overruled and the judgment of the lower Court is affirmed. Decree will be entered in accordance with the above and the costs of the appeal will be taxed against the appellant.

MATHERNE and NEARN, JJ., concur.